IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 3, 2025

IN RE **WILLOW B.**

**Appeal from the Juvenile Court for Warren County**
**No. JV3047      Ryan J. Moore, Judge**

_____

**No. M2024-01126-COA-R3-PT**
_____

A father appeals the termination of his parental rights for abandonment by an incarcerated parent, persistence of conditions, and failure to manifest an ability and willingness to assume custody of his child. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;
Case remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Matthew S. Bailey, Sparta, Tennessee, for the appellant, Stephen B.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**Background**

Willow B. (the "Child") was born to Amanda P. ("Mother")[2] and Stephen B. ("Father") in April of 2020. The Tennessee Department of Children's Services ("DCS") received a referral in October of 2022 alleging drug exposure and domestic violence in the parents' home. The referral also claimed that Father was present in the home, despite being subject to no-contact bond conditions stemming from an altercation with Mother on October 13, 2022. DCS did a home visit on October 15, 2022. On October 17, 2022, DCS

---

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights to protect their privacy and identities.

[2] Mother's parental rights are not at issue in this appeal. Mother is mentioned only for context.

filed a petition to declare the Child dependent and neglected and seeking temporary legal custody in the Juvenile Court for Warren County (the "trial court"). DCS alleged that during the home visit on October 15, 2022, Mother appeared erratic and incoherent. The DCS case worker observed empty alcohol containers about the house as well as cigarettes on the floor.

The trial court entered an order on October 18, 2022, granting DCS's petition and placing the Child in state custody. The trial court found probable cause to believe the Child was dependent and neglected and ordered any visitation with the parents to be supervised. The trial court later entered an order adjudicating the Child dependent and neglected as to Father. During the custodial period, the trial court ratified two family permanency plans. The first plan, dated November 9, 2022, required Father to complete an alcohol and drug assessment and follow any recommendations; appropriately visit with the Child; complete a mental health assessment and follow any recommendations; obtain and maintain a legal source of income; obtain and maintain safe and stable housing; resolve criminal charges and refrain from obtaining any new charges; and complete a parenting assessment and follow any recommendations. The second plan, dated June 8, 2023, contains largely the same requirements. Father remained incarcerated for much of the custodial period, but even during the periods he was not incarcerated, he had no contact with the Child.

DCS placed the Child with Christy R. ("Foster Mother"), who has known Mother for many years. Although the Child was over two years old at the beginning of her placement, she was essentially non-verbal. The Child could only say one word – "horse." Further, the Child suffers from a genetic disorder called Phenylketonuria ("PKU") which makes it difficult for the Child's body to process and break down protein. Because of her PKU, the Child requires a specialized diet as well as regular treatment by a geneticist and dietician.

DCS filed its petition to terminate Father's parental rights on September 15, 2023. For statutory grounds, DCS alleged abandonment by failure to visit by an incarcerated parent, persistence of conditions, failure to manifest an ability and willingness to assume custody of the Child, and substantial noncompliance with the permanency plan.[3] DCS further alleged that terminating Father's parental rights would serve the Child's best interests. The trial court held a bench trial on April 12, 2024, at which Father, DCS case worker Imara Leftwich, and Foster Mother all testified. Father acknowledged in his testimony that he remained incarcerated and was awaiting trial. Exhibits in the record show that while the Child was in DCS custody, Father was charged with theft, criminal impersonation, and possession of methamphetamine. Nonetheless, Father maintained that he was a primary caregiver for the Child prior to her placement into DCS custody. He

---

[3] At the beginning of trial, DCS announced that it would not pursue the statutory ground of substantial noncompliance and abandoned that claim.

stated that when he was not working, Father would feed and play with the Child, as well as take her to doctor's appointments in Nashville. Father also testified that he did not visit the Child during the custodial period because his car had been stolen and because he did not know how to contact the Child. Although Father was awaiting his criminal trial and was unsure when he would be released from jail, he asked the trial court to grant him more time to work on his permanency plan and remained adamant that he could care for the Child upon his release.

Ms. Leftwich and Foster Mother both testified about the Child's progress in her current placement. According to Foster Mother, the Child was developmentally delayed and "out of control" upon first entering custody. Per Foster Mother, the Child would bang her head into things, pull out her own hair, throw items, and slap people. Foster Mother had to secure all the items in her living room when the Child first arrived, as the Child was prone to throw things. However, Foster Mother testified that the Child has improved since starting occupational and speech therapy and now talks regularly. Foster Mother opined that managing the Child's PKU is time and labor-intensive; Foster Mother and her husband must carefully monitor the Child's protein intake, even going so far as to weigh the Child's food and log her protein intake in a food diary. Foster Mother testified that the Child still struggles with temper tantrums at times but can stay better regulated when her diet and routine is properly maintained.

At the end of the bench trial, the trial court ruled orally and terminated Father's parental rights. The trial court entered its final written order on July 9, 2024, and this appeal followed.

## ISSUES

Father raises two issues on appeal:

I. Whether the trial court improperly determined that grounds exist to terminate Father's parental rights.

II. Whether the trial court improperly determined that the termination of Father's parental rights is in the Child's best interests.

## STANDARD OF REVIEW

"A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)). "Because of the profound consequences of a decision to terminate parental rights, a petitioner must prove both elements of termination by clear and convincing

- 3 -

evidence." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023). This heightened burden "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).

As our Supreme Court recently explained, we employ a two-step process in reviewing termination cases:

> To review trial court decisions, appellate courts use a [] two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d at 457.

DISCUSSION

### Grounds for termination

#### Abandonment by an incarcerated parent

The trial court found that Father abandoned the Child through his failure to visit her prior to his incarceration. Abandonment by an incarcerated parent is grounds for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1).[4] Abandonment occurs, among other circumstances, when:

> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action if the child is four (4) years of age or more or three (3) consecutive months immediately preceding the filing of the action if the child is less than four (4) years of age and has:
>
>         \*        \*        \*
>
> (*2*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first ninety (90) days of nonincarceration immediately preceding the filing of the action if the child is less than four (4) years of age[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

First, it is undisputed that the Child was less than four years old when DCS filed its petition. Second, we must address the applicable period of Father's nonincarceration as outlined in the statute. It is undisputed that Father was incarcerated on September 15, 2023, the day DCS filed its petition for termination of his parental rights. It is also undisputed that Father was incarcerated for part of the determinative three-month period preceding the petition being filed. When this circumstance arises, the trial court must correctly piece together the periods of nonincarceration preceding the filing of the petition[5] and then look at that aggregated period for purposes of parental abandonment. *See In re Elijah F.*, No.

---

[4] In termination cases, we apply the version of the statute in effect at the time the petition was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

[5] The day the petition was filed does not count towards the ninety-day aggregation. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at \*6 (Tenn. Ct. App. Feb. 20, 2014).

M2022-00191-COA-R3-PT, 2022 WL 16859543, at *5 (Tenn. Ct. App. Nov. 10, 2022). Regarding the determinative period, the trial court found that "from October 17, 2022 to December 14, 2022, [Father] was not incarcerated. [DCS] also showed other times that he was not incarcerated that would make up the relevant three-month time period, including from December 16, 2022 to January 26, 2023[.]"

On appeal, Father accurately notes that he "was incarcerated at the time of filing of the termination petition and during the three months preceding the filing of the action. . . . So, the look back period would be the first ninety days of nonincarceration immediately preceding the filing of the action." He also notes that "[t]he statute does not provide for just any ninety-day period. . . . Rather, it is during an aggregation of the **first** ninety (90) days of nonincarceration **immediately** **preceding** the filing of the action." (Quotation omitted). Consequently, Father argues, and we agree, that the trial court erred in its analysis of the correct determinative period. However, a calculation error in the determinative period "can be considered harmless when the trial court made sufficient findings of fact that encompassed the correct determinative period[.]" *In re Elijah F.*, 2022 WL 16859543, at *5 (quoting *In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *9 (Tenn. Ct. App. Jan. 31, 2019)).

Accordingly, the question becomes whether the record contains sufficient evidence of the correct determinative period, and whether the trial court's final order contains sufficient findings encompassing that period. Although Father could not recall the exact dates of his various incarcerations, Ms. Leftwich testified about this topic. Specifically, she stated that Father was incarcerated from January 7, 2023 through February 17, 2023, and again from April 25, 2023 through May 3, 2023. Father was arrested again on July 26, 2023 and remained in jail at the time of trial in April of 2024. Father did not dispute this testimony at trial, and the trial court made an express finding that Ms. Leftwich is credible. Under these circumstances, we can piece together the first ninety days of nonincarceration preceding the filing of the petition from the evidence in the record. The first ninety days of Father's nonincarceration preceding the petition's filing was April 17, 2023 through April 24, 2023 (8 days), aggregated with May 4, 2023 through July 25, 2023 (82 days). The trial court found in its final order that Father did not visit or otherwise contact the Child at any point during the custodial period, a fact that Father does not dispute. As such, the trial court made sufficient findings of fact that encompassed the correct determinative period, and any miscalculation by the trial court is harmless error. *See In re Elijah F.*, 2022 WL 16859543, at *5.

Father also claims that his failure to visit was not willful because his vehicle was stolen during one of his incarcerations, and so he could not visit the Child. It is "a defense to abandonment for failure to visit . . . that a parent or guardian's failure to visit or support was not willful." Tenn. Code Ann. § 36-1-102(1)(I). The parent bears the burden of proof to establish, by a preponderance of the evidence, that his failure to visit was not willful.

- 6 -

*Id.* Father did not meet this burden. Although he was incarcerated for part of the custodial period, there were also several portions of that period during which he was not incarcerated. He did not reach out to Ms. Leftwich for assistance with visiting or contacting the Child. Ms. Leftwich testified that to the extent transportation was a barrier to visitation, DCS could have assisted. Ms. Leftwich testified that she could have driven Father to visits. This never came to fruition, however, because Father never contacted Ms. Leftwich when he was out of jail despite having been given her information. Given this, Father did not establish that his failure to visit the Child was not willful.

As such, we agree with the trial court's conclusion that Father abandoned the Child through his failure to visit.

*Persistent Conditions*

Next, the trial court terminated Father's rights pursuant to Tennessee Code Annotated § 36-1-113(g)(3). Section (g)(3)(A) provides that termination may occur when:

> (3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).

As we have previously explained:

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, [2008 WL 4613576, at *20] (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016). Additionally,

this ground for termination may be met when either the conditions that led to the removal persist or "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian[.]" [Tenn. Code Ann. §] 36-1-113(g)(3)(A)(i). Thus, even if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown.

*In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at *9 (Tenn. Ct. App. Nov. 9, 2021).

Here, the trial court found that DCS proved this ground by clear and convincing evidence. We agree. DCS removed the Child from the parents' home in October of 2022 based upon drug and alcohol exposure and because Father was coming about Mother despite a no-contact order stemming from a domestic assault charge. At the time of trial, Father was incarcerated pending trial for additional charges. Clearly, the issues with Father's parenting were not resolved during the custodial period. Moreover, it is undisputed that the Child's PKU renders her medically fragile. Foster Mother testified that

the Child's behavior and cognition are affected when her special diet is not maintained. The Child must eat specific fruits and vegetables, as well as carefully portioned servings of protein. Troublingly, Father asserted at trial that "about all [the Child] can have" is fruit, powdered eggs, or pancakes. Father's testimony shows limited knowledge about the Child's delicate condition; indeed, he also testified that PKU would resolve by the time the Child turns eighteen, which Foster Mother disputed.[6] The Child's medical fragility is another condition that likely would result in harm befalling the Child should she return to Father's custody. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). The reality is that the Child is very high-needs and requires a consistent routine, and Father is simply unable to provide that. Because the Child is in a pre-adoptive home with parents who are familiar with her PKU and have established a consistent care plan, the continuation of the parent-child relationship with Father greatly diminishes her chances of "early integration into a safe, stable, and permanent home[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii).

The trial court correctly determined that Father's parental rights should be terminated due to persistence of conditions.

*Failure to manifest an ability and willingness*

The final statutory ground for termination found by the trial court was failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. This ground applies when

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires clear and convincing proof of two elements. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* The statute requires "a parent . . . to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *Id.* at 677. Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

---

[6] No party objected on the basis that expert medical testimony should have been provided regarding the Child's disorder.

Regarding the second statutory prong,

[t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court found as follows regarding this ground:

47. Through [Father's] testimony, it is clear that [he] does not know exactly what the [C]hild needs. [Father] was unable to state the providers that the [C]hild has, including the nutritionist, dietitian, and geneticist. [Father] was unaware of the [C]hild receiving occupational therapy or speech therapy. Ms. Leftwich told him the information several times. [Father] never attended any of the [C]hild's doctor visits while [she] was in State's custody. [Father] is just not willing to assume custody of the [C]hild.

\* \* \*

49. [Father] is incarcerated. It would be impossible for the [C]hild to live with him in jail and it would cause severe psychological harm if the [C]hild did.

50. Ms. Leftwich testified, and the Court finds, that there has been no child support paid by [Father] or [Mother]. Only a couple of token items have been provided for the [C]hild by [Mother], specifically the ABC booklet and some food, some of which were not appropriate for the [C]hild. [Father] has not sent any educational resources or toys to the [C]hild and has not visited the [C]hild since the [C]hild came into State's custody.

51. Ms. Leftwich and [Foster Mother] testified, and the Court so finds, that the [C]hild needs a very specific routine and neither [Father] nor [Mother] are able to provide this very strict routine for the [C]hild. Being placed in [Mother's] or [Father's] custody would have a damaging effect on the [C]hild, physically and psychologically. [Foster Mother] testified that if the

[C]hild does not have a specific diet, the [C]hild has outbursts. If the [C]hild does not see specific people, the [C]hild becomes very uncomfortable and also has outbursts.

52. Ms. Leftwich did everything she could to try to facilitate contact between [Father] and the [C]hild while [Father] was incarcerated. Ms. Leftwich testified there are resources available for an incarcerated parent as to contact with the [C]hild. [Father] never wrote any letters and never told Ms. Leftwich that he would like to speak to the [C]hild while incarcerated. [Father] testified that he was not able to do so.

Additionally, the trial court found Father's testimony not credible, while it found Ms. Leftwich credible. This Court does not disturb such a finding on appeal absent clear and convincing evidence to the contrary. *In re Arianna B.*, 618 S.W.3d 47, 60 (Tenn. Ct. App. 2020) (citing *Kelly v. Kelly*, 445 S.W.3d 685, 692–93 (Tenn. 2014)).

The record does not preponderate against the trial court's factual findings as to this ground, and we agree that DCS proved the ground by clear and convincing evidence. Father took essentially no steps towards reunification with the Child during the custodial period. He incurred new criminal charges, never paid child support, did not visit the Child, did not work on his permanency plan, and made no meaningful efforts to have contact with the Child. Despite his hollow claims otherwise, Father is not willing to assume custody of the Child. When examining willingness under section 36-1-113(g)(14), "'we look for more than mere words' and may consider whether a parent has attempted 'to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)).

As to the second statutory prong of section (g)(14), the trial court found that "placing the [C]hild in [Mother's] or [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the [C]hild." The record supports this finding. Again, the Child is medically fragile and requires a high degree of routine and consistency, as well as an incredibly specific diet. Removing her from a home in which this has been established would be not only difficult for the Child, but medically dangerous.

Thus, we affirm the trial court's ruling that Father's parental rights should be terminated pursuant to Tennessee Code Annotated § 36-1-113(g)(14).

*Best interests*

In addition to proving at least one statutory ground for termination, DCS must prove by clear and convincing evidence that the Child's best interests are served by terminating Father's parental rights. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 193 (Tenn. Ct. App. 2004)). Our termination statutes recognize that "[n]ot all parental misconduct is irredeemable" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interests must be viewed from the child's, rather than the parent's, perspective.").

When determining whether termination is in a child's best interests, we refer to twenty non-exclusive factors found at Tennessee Code Annotated § 36-1-113(i). The trial court correctly applied the relevant factors, reasoning as follows:[7]

> 56. Pursuant to Tenn. Code Ann. § 36-1-113(i)(A), the effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority, the Court finds that the [C]hild went into State's custody on October 15, 2022, placed with [Foster Mother] and her husband. They are willing to adopt the [C]hild. The [C]hild calls them Mommy and Daddy. Termination of [Mother's] and [Father's] parental rights would have a very positive impact for stability and continuity of placement.
>
> 57. Pursuant to Tenn. Code Ann. § 36-1-113(i)(B), the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition, the Court finds that as [Foster Mother] and Ms. Leftwich testified, the [C]hild has a very specific routine. There is a food diary that is kept by the foster family that is strictly adhered to. The [C]hild is doing much better now than when she came into custody on October 15, 2022. Her erratic behavior and her temper tantrums have subsided due to her diet and the foster parents' willingness to work with the [C]hild and foster the [C]hild's psychological needs. The foster parents take the [C]hild to doctor's appointments, speech therapy, and occupational therapy. [Foster Mother] is the [C]hild's primary caregiver. She always puts the [C]hild to bed. The foster father does a great job supporting that as well. Through testimony of Ms. Leftwich and [Foster Mother], the Court finds that

---

[7] In the interest of brevity, portions of the trial court's best interest analysis addressing only Mother are omitted.

the [C]hild has improved behavior-wise since being in the foster family's care.

58. Pursuant to Tenn. Code Ann. § 36-1-113(i)(C), whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs, proof showed through Ms. Leftwich's testimony that none of these have been met by the parents. Neither parent has paid any child support. Neither parent has contributed to the educational well-being of the [C]hild. . . . [Father] has not visited the [C]hild since the [C]hild came into custody and as such, has not contributed to any educational needs of the [C]hild. With respect to housing and safety needs, the Court finds this very concerning. Neither parent has proven safe and stable housing. [Father] is incarcerated. He has been incarcerated on and off since the pendency of this hearing and the dependency and neglect proceedings. He testified that he resided on Capshaw Road in Warren County. Ms. Leftwich said she visited that house four times during the pendency of the dependency and neglect proceedings, and at no time would [Father] ever come to the door. . . . There is no way the [C]hild could live at the Warren County Jail where [Father] is incarcerated.

59. Pursuant to Tenn. Code Ann. § 36-1-113(i)(D), whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment, [Foster Mother] and Ms. Leftwich testified that the [C]hild calls [Foster Mother] and the foster father "Mommy" and "Daddy" and does not call [Mother] or [Father] this. Since the [C]hild has come into custody, [Father] has not exercised any visitation with her. You cannot make a secure and healthy parental attachment without seeing the [C]hild . . .

60. Pursuant to Tenn. Code Ann. § 36-1-113 (i)(E), whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child, the proof shows that [Father] never visited or exercised any type of visitation with the [C]hild since the [C]hild came into custody on October 15, 2022 . . .

61. Pursuant to Tenn. Code Ann. § 36-1-113(i)(F), whether the child is fearful of living in the parent's home, the Court finds that this factor does not apply.

62. Pursuant to Tenn. Code Ann. § 36-1-113(i)(G), whether the parent, parent's home, or others in the parent's household trigger or exacerbate the

child's experience of trauma or post-traumatic symptoms, the Court finds that this factor does not apply.

63. Pursuant to Tenn. Code Ann. § 36-1-113(i)(H), whether the child has created a healthy parental attachment with another person or persons in the absence of the parent, the Court finds that the parental attachment has been created between the [C]hild and foster parents, and also between the [C]hild and the other siblings in the foster home. Ms. Leftwich and [Foster Mother] testified, and the Court so finds, that these are healthy relationships. One child in the home is close in age, is very smart, and helps [the Child] with her homework and things of that nature. Th[at] child helps [the Child] learn different things that a child of this age would learn. [Foster Mother] testified that [the Child] is always excited to see her siblings.

64. Pursuant to Tenn. Code Ann. § 36-1-113(i)(I), whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage, the Court finds that [Foster Mother] and Ms. Leftwich testified that [the Child] has a great relationship with her foster siblings, likes to play with them, and introduces them to Ms. Leftwich. [Foster Mother] knows [Mother] and knew [Mother] before the [C]hild came into custody. The Court is confident that any type of heritage information that [Mother] wanted to share, the foster parents would be happy to present to [the Child] as they saw fit.

65. Pursuant to Tenn. Code Ann. § 36-1-113(i)(J), whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner, the Court finds the following: [Mother] has been convicted of driving under the influence. She also admitted to Ms. Leftwich that she was an alcoholic. She has tested positive for alcohol. That would certainly not be safe or in [the Child's] best interests. [Father] has a history of domestic offenses since the [C]hild has been born, as has [Mother]. The Court incorporates herein by reference the findings of fact made in the Persistence of Conditions ground above. There have been a lot of opportunities for [Mother] and [Father] to improve their conditions for [the Child], to make their homes safe, and they just have not done so.

66. Pursuant to Tenn. Code Ann. § 36-1-113(i)(K), whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions, the Court finds that Ms. Leftwich provided Bradford and Health Connect resources to both parents. They did not take advantage of those. Ms. Leftwich also provided Department resources for therapeutic visitations. The parents did not take advantage of those either.

67. Pursuant to Tenn. Code Ann. § 36-1-113(i)(L), whether the Department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the Department, the Court finds that the Department has made reasonable efforts to assist [Mother] and [Father] in making a lasting adjustment. These efforts are reflected in the Affidavits of Reasonable Efforts made exhibits to this hearing, the contents of which are incorporated herein by reference.

68. Pursuant to Tenn. Code Ann. § 36-1-113(i)(M), whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest, the Court finds that there has been no urgency on the part of [Father]. Since the [C]hild came into custody in 2022, [Father] has not exercised any visitation with [her]. [Father] has not proven safe and stable housing or a legal means of income. [Father] has not taken advantage of mental health assessments or other requirements that the Department offered. . . .

69. Pursuant to Tenn. Code Ann. § 36-1-113(i)(N), whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult, Ms. Leftwich testified, and the Court finds credible, that any type of domestic violence in a home where the child is present is not in a child's best interests and is very detrimental to the child. Both parents have a history of domestic violence, at least of being alleged perpetrators. With [Father] it was as to [Mother]. There was a prior case in 2022. [Father] is incarcerated now with charges pending for some sort of domestic assault and possibly a violation of bond conditions. . . .

70. Pursuant to Tenn. Code Ann. § 36-1-113(i)(O), whether the parent has ever provided safe and stable care for the child or any other child, the Court does not see any proof of that today through [Father]'s testimony or otherwise. At all times during the dependency and neglect case, [Father] has

either been incarcerated or at an unknown address which the Department could not verify. . . .

71. Pursuant to Tenn. Code Ann. § 36-1-113(i)(P), whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive, the Court puts a lot of emphasis on the strict dietary requirements for the [C]hild and keeping a journal or diary for food. [Father] was unable to testify as to the correct number of grams of protein and the exact type of foods that [the Child] needs. [Foster Mother] was very specific in the exact types of food that [the Child] needs. The food journal kept by the foster family was impressive, and this seems like a family affair to make sure that [the Child] has a proper diet. The Court finds that this condition will probably be with [the Child] for the rest of her life and maintaining a good diet is important, and the foster parents are able to do that. The biological parents have just not shown any proof that they are able to care for the [C]hild's strict diet. If the [C]hild does not have a good diet, testimony of [Foster Mother] and Ms. Leftwich has shown that the [C]hild acts out and just cannot emotionally thrive.

72. Pursuant to Tenn. Code Ann. § 36-1-113(i)(Q), whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive, the Court finds that the physical environment would not be appropriate for the [C]hild in the Warren County Jail where [Father] currently is. We do not know where he will be residing after his incarceration. Ms. Leftwich tried on four different occasions to verify [Father]'s Capshaw Road address with no avail. . . .

73. Pursuant to Tenn. Code Ann. § 36-1-113(i)(R), whether the physical environment of the parent's home is healthy and safe for the child, the Court finds that the physical environment would not be appropriate for the [C]hild in the Warren County Jail where [Father] currently is. We do not know where he will be residing after his incarceration. Ms. Leftwich tried on four different occasions to verify [Father]'s Capshaw Road address with no avail. . . .

74. Pursuant to Tenn. Code Ann. § 36-1-113(i)(S), whether the parent has consistently provided more than token financial support for the child, the Court finds that the proof showed today that no monetary child support has been given by either parent. . . . [Father] has not provided anything for the [C]hild, support or otherwise.

75. Pursuant to Tenn. Code Ann. § 36-1-113(i)(T), whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision for the child[,] . . . [b]oth [Mother] and [Father] have anger issues and there is domestic violence in their home. . . .

The record preponderates in favor of the above factual findings as to the Child's best interests. *See In re Carrington H.*, 483 S.W.3d at 535 ("Facts relevant to a child's best interests need only be established by a preponderance of the evidence . . .").  As the trial court aptly explained, Father is unable to provide the care that the Child needs, and she is thriving in her current environment.  Of particular importance in this case is the Child's genetic condition, as all of her medical needs are now appropriately managed. Considering how essential it is for the Child's current care plan to be maintained, removing her from her placement would be detrimental to the Child, both physically and psychologically.  This factor militates heavily in favor of termination under the circumstances. *See In re Addalyne S.*, 556 S.W.3d 774, 793 (Tenn. Ct. App. 2018) (citing *In re Navada N.*, 498 S.W.3d at 607) (noting that depending on the circumstances of a case, one single factor can dictate the outcome of a best interests analysis).

Father notes in his appellate brief that "[u]nproven factors weigh against termination."  While this may be true, there are essentially no unproven factors in this case; rather, there are a few factors that do not apply.  Looking at the totality of the circumstances and considering them from the Child's perspective, as we are required, we agree with the trial court that it is in the Child's best interests for Father's parental rights to be terminated.

Accordingly, the trial court's ruling is affirmed.

CONCLUSION

The judgment of the Juvenile Court for Warren County is hereby affirmed.  Costs on appeal are assessed to the appellant, Stephen B., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE